Taco Fire Products versus the United States. Good morning, and may it please the Court. Your Honors, this case, as you know from the briefs, is about items that have been referenced as glass bulbs, frangible bulbs, thermal release devices, and we have, of course— Has the tariff schedule been amended so that this problem doesn't exist in the future, that you've been given a no-duty classification for these items? The short answer to your question is, not today. There was a period of time that was referenced in the briefs to this amendment, this miscellaneous tariff bill, this 9904 tariff number. That expired. Those are good for three years at a time when Congress passes those laws. So as of today, 2016, the answer is no. So the same problem we're dealing with here is going to come up in the future? For sure. It's an ongoing issue. I just wanted to mention— But ongoing with the exception of one period of time where it wasn't? What happened was the duty rate in the tariff schedule, what I'll call the default duty rate under customs position, was this 5% duty. So Taco approached Congress to have this miscellaneous tariff bill passed, the MTB, and that's good for three years. That eliminated it. There are budget constraints, of course, with Congress when they waive duties in these scenarios. It was renewed after that first three-year period, but not to zero. In other words, instead of going from five to zero, it went from five to 0.9%. That also expired. So today, the environment we're operating in is the full 5% duty. And these items continue to be important? Yes. Yes. And the record does not reflect, although Council and I spoke this morning, just physical samples. If you wanted to see them, we provided them to Mr. Jones. There are pictures of them, but to the extent the Court wanted to actually see it and touch it and hold it in its hand, and Mr. Jones has the samples. In terms of the E-424, there's an exception and then two exceptions to the exception. Do you agree that, absent the exceptions to the exception, that these constitute Articles  I'm sorry, Your Honor. I didn't hear the very first part of your question. As I understand it, the first issue we're dealing with here is E-424. There's an exception to E-424 for Articles for Technical Uses of the Land. Oh, yes. I'm sorry. And there are two exceptions to the exception. And you and the government have argued about whether you come within the exceptions to the exceptions, right? Correct. My question is, and I think it's not entirely clear from the briefs, is if we were to determine hypothetically that neither of the exceptions to the exceptions apply, would the exception, that is, Articles for Technical Uses of Glass, apply? I think I got lost here in some of the exceptions to the exceptions to the exceptions. But at the end of the day, our position is, to the extent the Court rules, and maybe this is a hypothetical you're asking me, that we don't fall within the two exceptions that we've been arguing about in the brief, the high proportion and the static. If you say, no, those don't apply here. We're just talking about the plain language of that note. Then you're outside E-424. Well, it's chicken or an egg, of course, right? Because that note says Articles of Glass. We would have to then decide, is this an Article of Glass? And there's the reference in that language in the note, not in the two exceptions in the note, that references Heading 7020. So we still need to decide, are we in Heading 7020 as an Article of Glass? I'm not following this. As I understand your argument, you come within 8424 because you're within one or the other of the two exceptions to the exception, right? Your Honor, yes. If I may say, we've been arguing that to say that note that blocks us from going into 8424 doesn't apply because of those two exceptions, right? That's what's been in our briefs. Do you agree that if you don't come within those two exceptions to the exception, that you're outside of 8424? No, and I'm not trying to fight the hypothetical. I'm saying no because we have to resolve then, is it an Article of Glass? Meaning, just GRI-1 analysis, what does that mean, Articles of Glass? Okay. And I don't believe that, that the resolution of that question is tied to those two exceptions that you were asking about. So if I discard those and say, you tell me, Mr. Rohl, forget those two exceptions. We don't agree. Am I then an Article of Glass? I would say, well, let's look at 7020 and what does it mean to be an Article of Glass? Because it's not just glass. So you're saying that the same issue with respect to 7020 exists with respect to the exception in 8424, that is, whether it's an Article of Glass. Yeah, we have to resolve as the essential character of this thing, glass or not. Okay. So, and I think when we resolve those two issues to stay with your hypothetical by saying you don't meet those two exceptions there because it's not a high proportion or it's not mechanical, to me that does not resolve the essential character question. Okay, I understand what you're saying. What about this, the government relies on this Brussels history to interpret the tariff schedules here. I can't understand from the briefs what the connection is between the Brussels history and these provisions here. Is there some indication that Congress relied on the Brussels history in enacting these tariff provisions? Was it somehow implementing those Brussels provisions? What's the connection? It's sort of in legislative history, if I can use that phrase, the explanatory notes, right? We have a current tariff schedule is law. Right. We have explanatory notes that are in effect today. And these are two generations ago, I feel, or two versions of the tariff ago that the government has brought up to try to explain this phrase high proportion. To me, they're wholly irrelevant. But what's the connection between Brussels and the U.S. tariff schedules? I mean, there is none in that from the Brussels tariff nomenclature and today we have the harmonized tariff schedule. The connection, though, would be today's tariff schedule was modeled on, sort of derived from, was born out of or kind of morphed from the Brussels tariff nomenclature. What do you mean morphed from? I don't understand that. I mean, there must be some kind of legislative history. Well, it's not a secret that the harmonized tariff schedule of the United States in effect today was from a treaty in 1989 that we signed that many countries agreed to. And that nomenclature that came from the treaty was based on the Brussels tariff nomenclature. Okay, so this treaty obligated the United States to implement the Brussels agreement. Regarding the harmonized tariff schedule. In other words, all these tariff schedules are buckets, right? They're categories. We said 84-24, they said 70-20. In the Brussels tariff nomenclature, there were 70-20 articles of glass. 84-24. So they're based on their derived... Congress was trying to implement the Brussels agreement. Is that what you're saying? In the harmonized tariff schedule. I do not believe, I've never understood in my 22 years of practice that we're implementing the Brussels agreement. We're implementing the harmonized tariff system. There's a law that enacted our tariff schedule was to enact a harmonized tariff schedule. And in doing that, they just look to the... Correct. Because remember before, there's an in-between step here, which we're missing. Today is the HTS, we all talk about in all these tariff cases. Before, that was the TSUS, right? Called the TSUS, which was completely different than the Brussels tariff nomenclature. But that was the law in effect in this country before the HTS. Right. But what I'm trying to get at is, what's the connection between the Brussels nomenclature? I mean, what did Congress think it was doing that makes the Brussels agreement relevant here? To my knowledge, there's not language in the law that was passed enacting the HTS or in the legislative history that said our intent here is to give effect to the Brussels tariff nomenclature. But to the extent it is relevant, which again, we've contended it's not, I think it actually supports our position rather than hurts it, if I can just comment on that briefly. The relevance the government is saying is we have this phrase high proportion in the explanatory notes. And we're trying to figure out what that means. In the record in the joint appendix, Judge Rustani also was asking for information. What does this mean, high proportion? And the government said, well, when they were creating these notes in the Brussels tariff nomenclature, they had a discussion. There was a discussion. All that's reprinted in the joint appendix. There was people, like in this case, were wrestling with if it's glass, it's something else. Do we treat it as glass or is something in Chapter 84 what we're contending? And then the Germans brought a sample, if you will, to the Brussels committee and said, what do we do with this? It was discussed. Sample of what? Of the article that was in question in 1969, which was an evaporator unit. So there was discussion about saying, well, let's borrow the note that goes in the Brussels tariff nomenclature with Chapter 90, the Chapter 90 provision that talks about mainly, that when you have glass and something else, Chapter 90 resolves it by saying it's got to be mainly the other thing for it to not be glass. And the government said, well, that should be how we interpret high proportion because if you look at the history, that's what it means. But there's discussion there in those pages that are in the appendix, and I can give you a specific page in a moment, but that would be arbitrary to use a percentage. And when you look at what they actually adopted, they didn't adopt the actual language from that provision 90-25 that used mainly. They said high proportion. So we're still left with what does that mean? In the Brussels nomenclature. In the explanatory notes to the harmonized system, yes. Which are based on the Brussels tariff nomenclature. In the Brussels nomenclature, they had an equivalent of 84-24, right? That is correct. In that one, did they use main or high proportion? In the Brussels tariff nomenclature, again, depends which year we're talking about, the explanatory notes always said, and I see I'm over my time here, I'll just try to wrap up to answer your question. There's nothing in Chapter 84 in the Brussels tariff nomenclature, not in 1969, not in 1970, or any time that said mainly for Chapter 84. The mainly reference... High proportion? High proportion was put in there, that is correct. And I've eaten up my time here. We have a couple more comments before... I mean, just briefly, I suppose our... To summarize and to boil it down, our complaint here is, of course, Judge Rastani will have made a decision on essential character, which is one of the factors that came up in trying to figure out which is more important. When we look at facts, if you look at the joint appendix and the pages that are in there, there's no evidence. Yes, he made a conclusion, but to me the issue is, where are the facts to support that? And when you look at the testimony, there's only one witness in this case, and you look at the joint appendix pages of his testimony, and you read what he had to say, over and over again, he made very clear why it was the liquid that was the brains of this thing. We gave the example in our brief, my last comment. Again, if there's a fire in this courtroom, what's going to be important is that the fire is put out quickly by the sprinkler system, and that's all driven by the liquid, not by the glass. Thank you. I'm just going to reserve the last three minutes. Good morning. May it please the Court. Mr. Rule is right. There was one witness in this case, and he knows a lot about the products, which is why we used his testimony to support our motion for summary judgment, number one and number two, and our appeal here. But he's not qualified to opine on classification. That's first Judge Rastani's job, and now your job. The products here, Mr. Stone. What about the Brussels? What's the relationship between that and the Harmonized Tariff Schedule? Well, as Mr. Rule said, it was the predecessor to the various tariff statutes that followed, and there is consistency. I don't understand. Brussels is not a predecessor of a U.S. statute. It is, but it's the international. Well, it's not the U.S. statute. The Harmonized Tariff Schedule is an international. We have a U.S. statute. Right. I'm trying to understand what this U.S. statute has to do with the Brussels nomenclature. It is the predecessor to the Harmonized Tariff Schedule. The Harmonized Tariff Schedule of the United States is the adoption of the Harmonized Tariff Schedule, which goes up to the six-digit subheading. The U.S. part— From where? Excuse me. From Brussels? From the Harmonized System Committee. I'm not understanding this at all. You've got to help me. The world— There's a U.S. statute. There's a Brussels nomenclature. Why should I look to the Brussels nomenclature to interpret the U.S. statute? Because it's been consistent, and it is the predecessor to what ultimately became the Harmonized Tariff Schedule of the United States. The ITC recommends adoption of certain provisions when they're changed, and Congress generally simply adopts those. The ITC also can encourage eight-digit provisions, which is the last subheading in the Harmonized Tariff Schedule. But there's been consistency throughout, from the Brussels tariff nomenclature through the tariff schedule of the United States through the HTSUS, and in particular, Chapter 84— But you're not telling me why I should look to Brussels. You say it's a predecessor. A predecessor—you can't have something from Brussels be a predecessor of a U.S. statute. You can have it as guidance. I'm not saying it's legislative history. Who said that it provides guidance? I mean, when they enacted the U.S. statute, the U.S. tariff schedule, is there some indication that they were trying to implement the Brussels nomenclature or looking to the Brussels nomenclature? What's the connection? The connection is that there is consistent history throughout the various international customs and tariff treaties, and Brussels tariff nomenclature was one that was in effect in the 60s. And it's not that there's a law that says you must look to the Brussels tariff nomenclature, but there has been a consistent course throughout, and if you actually look to the tariff schedules of the United States and before that the Brussels tariff nomenclature, and currently you will see a consistency in the organization and in the provisions. And so if you're looking for what is intended to be precluded or included in a particular provision, it's not the explanatory notes help you. I'm sorry. This is not helping me understand what the connection is, but I guess you better go on. Okay. Well, in any case, there was a provision similar to the claim provision here in the Brussels tariff nomenclature, and it excluded technical articles of glass. And there was an entire discussion as to whether or not an explanatory note ought to go in there that talked about equating the explanatory note for Chapter 90. And eventually in 1972, an explanatory note was put into the Brussels tariff nomenclature. That explanatory note has carried through precisely both the one to 9025 and the one to Chapter 84, Note 1C, through today. So there is a consistent history in how technical articles of glass that are excluded from Chapter 84 have been considered. So whether or not you think there's a direct line between Congress enacting the HTSUS and the Brussels tariff nomenclature, there's certainly a consistency in the language used throughout not only the statutory provisions or the tariff provisions, but the explanatory notes that guide you in determining whether or not something is or is not in Chapter 84. What about the change from mainly to high proportion? That, honestly, I can't explain. I'll be honest with you. It's a different language, though. It is a different language. But the term high proportion appears in a number of different provisions in the HTSUS, primarily without quantification. Mr. Rohl in his brief… Do you agree that the words mainly and high proportion probably have different meanings because they're different words, right? Not if you look back to the Brussels tariff nomenclature, as Judge Rustani did, because it's very… Was the Brussels nomenclature for 84-24, did it ever use the term mainly? No, it did not. But the committee notes, the CCC, the Customs Corporation Council, notes indicate very clearly that by a majority vote there was an intent to carry the EN from 90-25 into 84. I don't know why the language ended up being high proportion, but it was clearly intended in 90-25 that there would be more other materials than glass in order to take it out of Chapter 84. But there's also other provisions, and they're in the appendix, that use the term high proportion in the explanatory notes. Now, remember, we're not talking about statutory language. We're talking about the explanatory notes, which are really just used for guidance here. So there is no statutory language talking about high proportion. But to the extent you do use the explanatory notes for guidance, as we hope you should, most of the times when high proportion is used in the explanatory notes, high proportion isn't quantified. There's no parenthetical. Mr. Roll has latched on to a single parenthetical from the hard rubber provision that talks about as much as 15% or up to 15%. And that is clearly not the provisions that are at issue here. And what's omitted is also a notation that the only other parenthetical with a quantity in it is for Heading 32-14, which deals with mastics that are based on plastic, and that says up to 80%. So if you look at the context for what high proportion means, the context here is that there's a clear line starting in the 1960s that high proportion in this explanatory note was intended to follow the one for Heading 90, which says mainly. In fact, it still says mainly. And there's no indication that high proportion throughout the explanatory notes is intended to mean 15%. Remember the explanatory notes. Suppose we reject that. Where are we? Suppose we don't look to the Brussels Agreement or the Brussels Nomenclature or we don't think it's informative even if we do look to it. Suppose we reject that relationship. We're just stuck with construing high proportion standing alone. Well, I would still argue that 16% to 32% is not a high proportion when you're talking about the relative weight. Is this a fact question? What's high proportion? Yes, but Jedrastani determined that it wasn't a high proportion here factually because 16% to 31% was not a high proportion. And I know you don't want to hear about the Brussels Tariff Nomenclature one more time, but in the BTN— I didn't want to hear about it. I just wanted to— No, I understand. Brussels Tariff Nomenclature, when they were talking about mainly high proportion, they actually were talking about weight. And here that's what we're talking about too, the weight of the glass versus the weight of the liquid. Tyco may consider that an arbitrary way of determining something, but it's a very traditional factor in determining whether something has a particular character. The question here is actually— The first question, there's actually two questions that have to be answered, is whether No. 1C precludes classification in the claim provision. And as we've argued in our brief, it does because there's no question this is a technical article. Tyco's claims are all in the technical use provision. And the question is simply whether they have the character of glass. And as Mr. Roll indicated, we have samples for you, and you can see you can look at them, and that certainly can be part of your consideration, whether they appear to be glass. The explanatory notes talk about losing the character of glass. So the presumption is that something that is glass starts out as glass, and the question is what, if anything, has been done to it to cause it to lose the character? Now, the explanatory notes provide a couple of guidelines. One is when there's a significant amount, a high proportion of another material, and the other is when the glass is simply static and the other component or the other material is mechanical. So that would be the first question to be answered, whether or not No. 1C applies here. And the second question, if you determine that No. 1C does in fact apply to remove these products from Chapter 84, is whether or not they were properly classified in Heading 7020, which would require an essential character analysis to determine whether the liquid component or the glass provides the essential character. There's a slight variation between the two. But I guess I'm wondering if under this essential character analysis, which applies to 7020, whether that doesn't also apply to 8424 in determining whether these articles were technically uses of glass, so that if we were to determine that these are not articles of glass, that would mean both that they were not within 7020 and it also would mean that they were within 8424, correct? The way I view the yes and no, there's a character issue and then there's an essential character issue. And they're very close, but there are slight variations. And the explanatory notes, which would be question one, does No. 1C preclude this, talks about the character. Try to help me here. If we were to agree with Tyco that this doesn't come within 7020 because these are not articles of glass, right? Wouldn't that also resolve the question of whether they come within 8424 without looking to those exceptions? No, not at all. Why is that? Well, we wouldn't agree that these bulbs would go in 8424, even if you disagreed with us on just about everything else. And the reason is, is because these articles are – all of the articles, all frangible thermal bulbs, according to Tyco's own engineer, are made of the same materials, are used in the same way, they work the same way. And so they should all be classified in the same provision, not necessarily 8424. They're all used in thermal devices, but that gets to whether or not they're parts. And all thermal bulbs should be classified the same way, the same way that the temporary – So what you're saying is you have another argument under 8424 as to why these don't come within it? Yes, but Judge Rustani did not reach that question. I understand. I'm happy to address it if you would like, but if you want to reach that question, it ought to be remanded for her to consider that in the first instance, or for whomever gets that – gets the case next. These articles have the character of glass, so Note 1C will preclude their classification in Chapter 84. And the reason is because if you look to the explanatory notes, they don't have a high proportion by weight of non-glass materials. And getting to the second guideline provided by the explanatory notes, there's not a static glass component with a mechanical liquid component. The liquid component is not mechanical. It expands by means of something called thermal expansion. It means when you heat something, molecules go fast, it expands. That's not mechanical. Rivets will do that in a building. You heat solids and heat most liquids, and they will expand because molecules move faster. But that is not – that's not machine-like. That's not akin to how a pump or a motor, which are the examples provided in the explanatory note, are mechanical. Pumps and motors are actually on their own classifiable in Chapter 84, and some motors are in Chapter 85. But that does not – that doesn't make this liquid a mechanical component. So you can eliminate the – you can eliminate the mechanical versus static. I see I'm into my – I'm always mindful of the clock. I appreciate that. Last sentence, finally. Okay. Basically, Note 1C does not allow the products here to be classified in Chapter 84, and so you would have to go on to determine whether or not it's the liquid component or the glass component that provides the essential character to determine whether heading 7020 is correct. And for that argument, I refer to my brief. Thank you very much. Thank you. So just quickly, in the three minutes that we have left, we're talking – one of the issues is character of glass or essential character of glass. If you've ever shipped something in the mail, a glass, or you've moved, did the moving company come, one of the characters of glass is supposed to be that it doesn't break. Here, the character of the glass or this item is to break. That's how the fire sprinkler ultimately operates. I would suggest if you look at context here in Chapter 70 where all the glass tariff codes are, those items, none of them are really designed to break. That's not the purpose. It's designed to break at a certain time, and otherwise it's designed to be applied, right? That is correct. But the reason there's a fire sprinkler, according to the testimony of the witness here, is to operate when there's a fire, not to just be a decoration in the wall holding it. It's not just a decoration. Obviously, we don't want the sprinkling system to go off when there's not, in fact, a fire. Exactly. Yes, it is playing that important role. The load factor that's been referenced in the briefs is obviously an important factor because nobody wants water sprinkling on them when there's no fire. However, that's just one of the functions, and the reason people put fire sprinklers are for when there's a fire, and that was the testimony of the engineer. Regarding the mechanical issue, which was on those two, from the explanatory notes, trying to explain what this exclusionary note 1C means, the government's position, Judge Rastani below, was referencing, because it says such as pumps, motors, et cetera, and interpreting from that to say, well, that must mean it has to be some kind of harder, I don't want to say mechanical, but something like a pump or a motor. Yet when you just look at the definition of mechanical, the definition of mechanical is not limited to that. It just has to do with relating to physical forces or motion. Examples in the dictionaries give examples of mechanical force of wind, mechanical forces on molecules, and that's exactly what's happening here. The glass is mechanical in that as it heats up, those molecules are going to bust or break the glass. To me, and Judge Rastani has said as much, she said, that's a definition of mechanical, what we cited below, but I don't think that's the right definition because of those two examples, pumps, motors, and I don't think that's a matter of tariff interpretation that we find, it's just some generis where you're trying to figure out what's like the other things, because the tariff, the statute will say A, B, C, and similar items and the like. That's not with languages, it's just simply et cetera. What happens here if we determine that the government, that you're both right, that it comes within 84-24 and also within 70-20? I guess when all else is equal, if you're saying they're both equally applicable, then GRI-3 would kick in and it would be the tariff last in the tariff schedule. Which would be 70-20? 84-24. 84-24. But I think, again, I don't want to fight the hypothetical. To reach that, you would have had to have concluded that that note doesn't apply. Just quickly on Judge Rastani's, and I have 30 seconds left, so I'll make this my last observation. Again, she rests on four facts for essential character, and in her briefs we discuss them, but I wanted to comment particularly on the duty suspension bill, which is the fourth of the items she relied on, which is we started this conversation, I think, talking about is that gone? Is this going to be a recurring problem? Yes, the law that was enacted by Congress referenced 70-20 for these items, but that's because Tyka was handcuffed, proverbially, by customs position, so to get around that or to get the relief from that, we had to reference 70-20 when we drafted the bill to present to Congress to have it passed. I'm out of time, and as with opposing counsel, I want to respect the clock, and I thank you for the argument. Thank you very much. We thank both sides for cases submitted. That concludes our proceedings for this morning. Thank you. All rise. The Honorable Court is adjourned from day to day.